FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
*4:18 pm, Jan 07, 2026*
JEFFREY P. COLWELL, CLERK

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-02453-GPG-TPO

**OLUWANISOLA ABOLAJI,**

Plaintiff, Pro Se,

v.

**ROUGHRIDERS LLC,**

Defendant.

---

**FOURTH AMENDED COMPLAINT**

---

Plaintiff Oluwanisola Abolaji ("Plaintiff"), proceeding pro se, brings this Fourth Amended Complaint against Defendant Roughriders LLC ("Roughriders" or "Defendant") and alleges as follows:

**I. PARTIES**

1. **Plaintiff Oluwanisola Abolaji** is a Black male of Nigerian origin and a resident of Frederick, Colorado. At all times relevant to this action, Plaintiff worked within the Roughriders sports enterprise and served as Director of Soccer for the Nisola–RoughRiders Futbol Academy program.

2. **Defendant Roughriders LLC** ("Roughriders" or "Defendant") is a Colorado limited liability company that owned, operated, controlled, and/or managed the Sports Stable facility in Superior, Colorado, and exercised control over the youth soccer program and related operations at issue in this action.

3. At all relevant times, Defendant was Plaintiff's employer and/or joint employer within the meaning of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and exercised authority over Plaintiff's compensation, work conditions, access to facilities, and continued employment.

**II. JURISDICTION AND VENUE**

4. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein occurred within the District of Colorado, including at the Sports Stable facility located in Superior, Colorado, and because Defendant conducts business in this District.

## III. ADMINISTRATIVE EXHAUSTION

6. Plaintiff has exhausted all administrative remedies required as a prerequisite to bringing claims under Title VII of the Civil Rights Act of 1964.
7. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination, a racially hostile work environment, and retaliation arising from his employment with Defendant.
8. The EEOC assigned Charge No. 541-2021-01536 to Plaintiff's charge.
9. On or about August 1, 2023, the EEOC issued a Determination and Notice of Right to Sue. Plaintiff received the Notice and commenced this civil action within ninety (90) days of receipt. (Exhibit 112 Right to Sue letter EEOC Roughriders)
10. All conditions precedent to the filing of this action under Title VII have been satisfied, excused, or otherwise fulfilled.

## IV. EMPLOYER IDENTITY, AGENCY, AND CONTROL

11. At all relevant times, Plaintiff was an employee within the meaning of Title VII of the Civil Rights Act of 1964and 42 U.S.C. § 1981.
12. Although Plaintiff held a minority ownership interest in a related soccer entity, Plaintiff performed services as Director of Soccer pursuant to Defendant's direction and control, and did not function as an independent contractor, partner, or co-equal decisionmaker.
13. On or about November 15, 2019, RoughRiders Holdings, LLC issued a written Letter of Intent expressly contemplating Plaintiff's employment, including salary, employment term, guaranteed facility access, centralized operations, and integration of soccer programs at the Sports Stable facility (see Exhibit 148).
14. Consistent with that agreement and the parties' course of conduct, Defendant placed Plaintiff on its regular payroll as a salaried W-2 employee, paying Plaintiff on a semimonthly basis in the gross amount of $4,166.67 per pay period, equivalent to a $100,000 annual salary, with federal and state taxes withheld and employer-side payroll taxes paid. Defendant's payroll records list Plaintiff under the "RRS – RR Soccer" department and reflect continuous salary payments throughout 2020 and 2021 (see Exhibit E).

15. Plaintiff did not possess unilateral authority to hire or fire himself, set or alter his compensation, control payroll, or determine the financial or operational infrastructure of the soccer program.

16. Defendant retained and exercised authority over the essential terms and conditions of Plaintiff's employment, including:

a. Access to and exclusion from Defendant-controlled facilities and training locations;

b. Scheduling, approval, continuation, or suspension of programs;

c. Allocation and control of payroll and financial resources;

d. Registration systems, accounting, and financial reporting;

e. Investigation and handling of workplace complaints;

f. Discipline and corrective action; and

g. The decision to suspend operations, dismantle the program Plaintiff built, and terminate Plaintiff's employment.

17. Defendant exercised this control through its owners, executives, managers, and agents, who supervised Plaintiff's daily working conditions and who received, reviewed, or failed to respond to Plaintiff's complaints of racial harassment, threats to safety, and discriminatory treatment.

18. RoughRiders Holdings, LLC and Defendant RoughRiders LLC operated as agents, alter egos, and/or an integrated enterprise with respect to Plaintiff's employment, payroll funding, facility control, and centralized management of the Sports Stable. Although payroll funds were routed through affiliated entities, Defendant exercised functional control over Plaintiff's employment, satisfying joint-employer and integrated-enterprise standards.

19. The use of affiliated entities to route payroll or fund wages does not alter Defendant's status as Plaintiff's employer where Defendant retained authority over hiring, supervision, compensation, and termination.

20. Under the totality of the circumstances, and applying the factors articulated in Clackamas Gastroenterology Associates, P.C. v. Wells, Defendant functioned as Plaintiff's employer and/or joint employer, including by controlling Plaintiff's work, compensation, supervision, discipline, and continued employment, notwithstanding Plaintiff's minority ownership interest.

21. Chad Jacobsen, who physically confronted Plaintiff on October 26, 2020, was not a third party. At all relevant times, Jacobsen was an employee, director, and business partner within the RoughRiders enterprise, serving as Director of Baseball and operating under Defendant's authority. His conduct occurred during working hours, on Defendant-controlled premises, and in the course of Defendant's operations, rendering Defendant responsible for his actions.

22. In determining employee status, courts look to the actual control exercised over the individual, not titles or ownership labels, and Defendant's control over Plaintiff's compensation, work, supervision, and termination satisfies the Clackamas factors.

## V. FACTUAL ALLEGATIONS

## A. Plaintiff's Background and Pre-Launch Operations

23. Plaintiff owned and operated a youth soccer program for more than fifteen (15) years before partnering with Defendants. Plaintiff's program had an established reputation, existing player base, and operational infrastructure prior to any formal relationship with Defendants.

24. In November and December 2019, prior to the formal launch of Nisola–RoughRiders Futbol Academy ("NRFA"), Plaintiff operated soccer camps and training programs at the Sport Stable facility in Superior, Colorado, with the knowledge and approval of RoughRiders-affiliated management. These programs were conducted on Defendant-controlled premises, publicly marketed as occurring at the Sport Stable, and formed part of the groundwork for the subsequent academy launch (see Exhibit 303).

25. On November 15, 2019, RoughRiders Holdings, LLC issued a written Letter of Intent to Nisola Futbol Academy, LLC memorializing the parties' agreement to form NRFA, with RoughRiders Holdings owning 51% and Plaintiff's entity owning 49%. The Letter of Intent set forth Plaintiff's $100,000 annual salary, a three-year term, guaranteed facility access at the Sport Stable, centralized back-office services, and the integration of camps, leagues, and training programs at the Sport Stable (Ex. 148).

26. In or about December 2019, Plaintiff entered into an employment agreement under which he served as Director of Soccer for NRFA, with compensation and terms consistent with the parties' Letter of Intent and subsequent course of performance.

27. Plaintiff thereafter performed substantial services in reliance on Defendants' representations, including building the program, hiring and managing staff, organizing programming, and generating revenue and goodwill at the Sport Stable.

28. From January 2020 through April 2021, Plaintiff served as NRFA's Director of Soccer/Executive Director and performed responsibilities including coaching youth players, managing staff, organizing programs, running camps and leagues, developing competitive pathways, and expanding the program's visibility and value within the RoughRiders enterprise.

## B. NWSL Franchise and Business Development Efforts

29. As part of NRFA's business development strategy, Plaintiff pursued professional soccer opportunities intended to increase NRFA's long-term value and create "youth-to-pro" pathways, including the pursuit of a National Women's Soccer League ("NWSL") franchise for Colorado.

30. In furtherance of that effort, Plaintiff engaged in discussions with league-connected professionals regarding the requirements and feasibility of a potential National Women's Soccer League ("NWSL") franchise in Denver, with the knowledge and involvement of RoughRiders ownership, including Tony Sdao, and coordinated related introductions

through third-party contacts, including communications facilitated by Britt Samuelson identifying individuals with league-formation experience (see Exhibits 304).

31. Plaintiff arranged and facilitated communications and meetings with NWSL-related stakeholders in furtherance of those efforts. On or about December 18, 2020, Plaintiff coordinated a proposed meeting involving Tony Sdao (Tony Sdao, an owner and senior decisionmaker within the RoughRiders enterprise) with Jeff Plush (former NWSL Commissioner) and Adams Miller, and communicated scheduling details for that meeting (Ex. 81).

32. Plaintiff also arranged and/or participated in discussions with soccer executives including Yael Averbuch (NWSL Gotham FC franchise General Manager), Alyssa Lahue NWSL Chicago Red Stars franchise General Manager), and James O'Connor (NWSL Racing Louisville franchise General Manager). Plaintiff will identify additional participants and supporting communications through discovery.

## C. Racial Harassment and Threats at Williams Field

33. Beginning in or about May 2020, while Plaintiff was performing his job duties at Williams Field in Superior, Colorado, Plaintiff was subjected to repeated racially hostile conduct. This conduct included monkey chants, the use of the racial slur "nigger," racially charged verbal abuse, and threats to Plaintiff's safety.

34. During the summer of 2020, a particular individual repeatedly targeted Plaintiff at Williams Field. This individual called Plaintiff racial slurs, made monkey noises while Plaintiff was coaching, physically assaulted Plaintiff, interfered with Plaintiff's work, and harassed youth players on Plaintiff's soccer team during training sessions.

35. Plaintiff promptly reported these incidents to management and supervisory personnel within the RoughRiders enterprise, including Defendant Rylan Reed and other senior executives. Plaintiff also documented the conduct and raised concerns regarding his safety and the safety of the children present at the field. Despite actual notice, Defendants failed to take prompt or effective remedial action to stop the harassment or protect Plaintiff.

36. In or about July 2020, a Town of Superior official informed Plaintiff that false complaints lodged against Plaintiff had been racially motivated, further corroborating that the harassment Plaintiff was experiencing was discriminatory in nature and known to third parties outside the organization.

37. Rylan Reed, at all relevant times, was a manager and partial owner of Impact Sports Performance, served as Director of Operations for the RoughRiders soccer program, and acted as a manager and agent within the RoughRiders enterprise, having been appointed to that role by RoughRiders ownership, including Tony Sdao.

38. On January 11, 2021, the same individual who had previously harassed Plaintiff at Williams Field appeared at the Sports Stable facility and resumed harassing Plaintiff there. This individual was not an unknown or random third party. Upon information and

belief, the individual was a customer of Impact Sports Performance and known to Defendant's management. Rylan Reed, a RoughRiders-affiliated manager and agent with operational authority over the soccer program, was contemporaneously informed of the individual's identity and prior conduct toward Plaintiff, including through real-time communications and video documentation provided by Plaintiff on the date of the incident (see Exhibit 305).

39. Despite this knowledge, Defendants permitted the individual continued access to Defendant-controlled facilities, failed to restrict or revoke his access, and failed to involve law enforcement or implement safety measures, even after Plaintiff provided video documentation and reported escalating threats and physical intimidation.

40. Plaintiff's hostile work environment was created through a combination of conduct by Defendant's employees, managers, and agents, as well as by known non-employees whose access Defendants controlled and failed to regulate. In all instances, Defendants had actual knowledge of the harassment, possessed the authority to intervene, and failed to take prompt, appropriate, or effective remedial action.

**D. Escalation of Harassment and Violence at the Sport Stable**

41. On October 26, 2020, while Plaintiff was conducting practice at the Sport Stable, Chad Jacobsen (RoughRiders-affiliated baseball director) aggressively confronted Plaintiff, chest-bumped him, used racially charged language including "know your role, boy," and threatened physical violence in the presence of children and witnesses. (exhibit 307 Chad Jacobsen video)

42. Plaintiff reported the incident to Defendants Tony Sdao, Rylan Reed, Derek Robinson, and CFO Michael Perry. Defendants minimized the incident, did not discipline Jacobsen, and did not implement protective measures.

43. Greg Preciado witnessed the October 26, 2020 incident and later provided a written statement describing Jacobsen's conduct and Defendants' failure to intervene (Ex. 147).

44. On October 29, 2020, another baseball-affiliated individual threatened Plaintiff with a baseball bat inside the Sport Stable facility. Plaintiff requested security footage, but Defendants represented that no video existed despite extensive camera coverage.

45. In late 2020, racial slurs were written on Plaintiff's coaching materials and in areas of the Sport Stable used by the soccer program. Plaintiff reported this vandalism to management; Defendants failed to conduct a meaningful investigation.

46. The same individual who harassed Plaintiff at Williams Field later appeared at the Sport Stable and continued to harass, intimidate, and menace Plaintiff there. Plaintiff reported this to management, including Rylan Reed, via text message and provided contemporaneous video documentation.

47. Despite direct notice and video documentation, Defendants failed to remove or ban the harasser from the facilities, failed to involve law enforcement, and failed to protect Plaintiff from continued contact.

48. Kari Mullen (Impact Sports Performance director) communicated to Plaintiff that the harasser's conduct was racist, unacceptable, and should not be tolerated, and confirmed she raised these concerns to management, including Rylan Reed, but corrective action was not taken.

49. On or about November 1, 2020, Plaintiff submitted a formal written complaint to leadership including Tony Sdao and Derek Robinson describing assault, threats, intimidation, and safety concerns, and stating Plaintiff did not feel safe at Williams Field or the Sport Stable (Ex. 4). Defendants acknowledged management responsibility and represented they would support Plaintiff and address the issues (Ex. 3), but did not implement effective protective measures.

**E. Management Knowledge, Admissions, and Corroboration**

50. Text messages between Plaintiff and Rylan Reed document Reed's awareness of safety concerns and the hostile environment, including Plaintiff's reports that he did not feel safe (Exs. 78–82).

51. In December 2020, Jimmy Dexter (Sport Stable general manager/head of security) aggressively confronted Plaintiff in a manner that escalated the hostile environment, including yelling at Plaintiff in front of youth players and parents.

52. In March 2021, parents of NRFA players submitted a written letter to senior Sports Stable and RoughRiders leadership describing racially motivated and criminal incidents affecting the program, including the word "GORILLA" written on a storage door used by NRFA and weapon-related conduct inside the Sports Stable facility, and demanding immediate action to ensure a safe, harassment-free environment (see Exhibit 306). Despite the seriousness of these allegations and the breadth of parental concern, Defendants failed to take prompt or effective corrective action.

53. Following receipt of parent complaints regarding racial harassment and safety concerns, Rylan Reed, a RoughRiders-affiliated manager, responded that the issues were "not under [his] purview" and disclaimed responsibility for addressing the reported incidents, notwithstanding that parents had previously raised similar concerns and had been reassured that the matter was being addressed (see Exhibit 125). No meaningful remedial measures were implemented, and the conditions described by parents were permitted to persist.

**F. Retaliation Through Financial Pretext, Coercion, and Program Termination**

54. Plaintiff repeatedly complained about racial harassment, threats to his safety, and hostile working conditions, and sought legal counsel regarding these issues.

55. In or about early 2021, Defendants escalated pressure tactics and advanced financial claims to justify adverse actions against Plaintiff and the soccer program.

### 1. Internal Records Contradicting Claimed Insolvency

56. In early 2021, Rylan Reed provided Plaintiff internal financial records reflecting NRFA was in a positive financial position at that time, including being more than $18,000 "in the black" (Ex. 130). These records conflicted with later financial summaries presented by Defendants Tony Sdao, Michael Perry, and Derek Robinson.
57. Reed also told Plaintiff that Defendants intended to claim Plaintiff "lost the company money" because Plaintiff complained about racial discrimination and that Defendants were using inaccurate numbers to justify termination.

### 2. Contradictory Financial Statements Used to Pressure Dissolution

58. Defendants later presented financial exhibits, including a Profit & Loss statement (Ex. 60) and another Profit & Loss statement (Ex. 67), which Plaintiff alleges misrepresented the program's financial condition and were used to support claims of insolvency and demands for dissolution and a capital call.
59. Under Plaintiff's employment and ownership agreements, Plaintiff was entitled to profit participation and ownership rights, including profit-sharing terms and a continuing 49% ownership interest. Plaintiff alleges Defendants' loss narrative was used to undermine those rights.

### 3. Attempted Inducement to Suppress Protected Activity

60. After advising Plaintiff of Defendants' termination plan, Reed conveyed an offer of $100,000 on behalf of Tony Sdao for Plaintiff to separate and not pursue a racial discrimination complaint.

### 4. Notice of Manager & Member Meeting and Coercive Pressure

61. On or about February 24, 2021, Plaintiff received a Notice of Manager & Member Meeting proposing actions including a capital call, bankruptcy, and dissolution (Ex. 68).
62. In early March 2021, during a youth practice at the Sport Stable, Defendant Tony Sdao confronted Plaintiff and demanded Plaintiff attend the manager/member meeting; Plaintiff can be heard stating he felt unsafe (Ex. 301). Plaintiff also possesses a recording of the Zoom manager/member meeting reflecting Defendants' financial pressure narrative and governance demands (Ex. 300).

### 5. March 11, 2021 Meeting Reflecting Manufactured Financial Crisis

63. At the March 11, 2021 manager/member meeting, Defendants asserted insolvency and demanded an immediate capital call of $150,000 while acknowledging there was no finalized or reviewed budget and relying on prior work by Plaintiff and Reed. The

meeting transcript reflects repeated efforts to rush Plaintiff into an immediate decision and to leverage alleged insolvency to compel dissolution (Ex. 300).

### 6. April 9, 2021 Payroll Letter and Shutdown

64. On April 9, 2021, Michael Perry issued a letter furloughing employees and asserting lack of funds while stating RoughRiders Holdings would loan money to cover payroll and later demand repayment (Ex. 69). Plaintiff alleges this letter relied on the same disputed financial narrative used to pressure dissolution and followed Plaintiff's protected activity and refusal to agree to dissolution under coercive circumstances.

65. On March 26, 2021, Defendants informed parents that the soccer program was being terminated. In early April 2021, Plaintiff was notified that his employment had ended and was instructed to apply for unemployment. The temporal proximity between Plaintiff's protected activity and Defendants' adverse actions supports an inference of retaliatory motive.

### G. Withholding of Financial Records and Early Operations Accounting

66. Defendants have refused to provide complete accounting records relating to camps and programming operated at the Sport Stable in November and December 2019, including registration data and revenue information, despite Plaintiff's ownership interest and repeated requests. These records are within Defendants' possession, custody, and/or control and are necessary to determine profits owed and damages.

### H. Discriminatory Financial Control and PPP-Related Allegations

67. In early 2021, Defendants requested and/or pressured Plaintiff to accept a significant pay reduction, purportedly due to financial constraints. Plaintiff pleads this to show retaliatory and discriminatory financial control, not as a standalone statutory fraud claim.

68. Upon information and belief, similarly situated white directors and programs were not asked to take comparable pay cuts and maintained compensation.

69. Defendant entities obtained Paycheck Protection Program ("PPP") funds intended to maintain payroll. Plaintiff alleges Defendants nonetheless used payroll and financial control in a manner that disadvantaged Plaintiff and the soccer program after Plaintiff's protected activity. NRFA bank records and financial exhibits reflect payroll and funding flows relevant to these allegations (see Ex. 105).

70. Upon information and belief, Defendant received PPP-related funding intended to support payroll continuity, yet Plaintiff was pressured to take a pay reduction and the program was shut down shortly thereafter. These facts are alleged to show Defendant's asserted 'no funds' justification was inconsistent and pretextual.

### I. Emotional Distress and Psychological Harm

71. As a direct result of the hostile environment, intimidation, and threats described above, Plaintiff suffered severe emotional distress including panic attacks, insomnia, anxiety, and related symptoms.

72. In or about January 2021, Plaintiff sought treatment from a psychotherapist, Nili Feingold, in Boulder, Colorado, and was treated intermittently between January and April 2021. Treatment notes reflect symptoms including inability to sleep, intrusive thoughts, hypervigilance, and fear of returning to the workplace, which intensified when Plaintiff returned to the Sport Stable and diminished when Plaintiff was away (Ex. 111).

**COUNT I – HOSTILE WORK ENVIRONMENT** *(Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981)*

73. Plaintiff incorporates by reference Paragraphs 1–48 as though fully set forth herein.

74. Plaintiff is a Black male of Nigerian origin who, at all relevant times, was employed by Defendant RoughRiders LLC as Director of Soccer and Executive Director of the Nisola–RoughRiders Futbol Academy.

75. Throughout his employment, Plaintiff was subjected to unwelcome harassment and intimidation because of his race and color. The harassment was perpetrated by Defendant's employees, managers, and business partners, as well as by known non-employees whom Defendant permitted to access and remain within Defendant-controlled facilities. At least some of the harassing conduct was committed directly by Defendant's employees, managers, and business partners acting within the scope of their authority.

76. The harassment included repeated use of racial slurs (including "nigger" and "boy"), monkey chants, racially charged threats of physical violence, physical intimidation, interference with Plaintiff's work activities, and racially motivated vandalism.

77. This conduct occurred at Defendant-controlled worksites, including Williams Field and the Sports Stable facility, while Plaintiff was performing his job duties, often in the presence of youth athletes, parents, and coworkers.

78. Defendant exercised control over these worksites and over the individuals present there, including authority to discipline employees, regulate or revoke access, remove non-employees, and implement safety measures. Defendant failed to exercise this authority. Defendant's failure to take corrective action occurred despite repeated notice, actual knowledge of the harassment, and the foreseeability of continued misconduct. Accordingly, Defendant is liable for the hostile work environment created by its employees and by known non-employees whose conduct Defendant knew or should have known about and failed to address through prompt, reasonable measures under Title VII and 42 U.S.C. § 1981.

79. Defendant exercised control over these worksites and over the individuals present there, including authority to discipline employees, regulate or revoke access, remove

non-employees, and implement safety measures. Defendant failed to exercise this authority.

80. Defendant failure to take corrective action occurred despite repeated notice, actual knowledge of the harassment, and the foreseeability of continued misconduct, rendering Defendant liable for harassment by both employees and known non-employees under Title VII and 42 U.S.C. § 1981.

81. The harassment was severe and pervasive, both subjectively and objectively. A reasonable person in Plaintiff's position would find the work environment hostile, intimidating, and abusive, and Plaintiff in fact experienced it as such.

82. The hostile environment altered the terms, conditions, and privileges of Plaintiff's employment by undermining his authority, disrupting his coaching duties, threatening his physical safety, and forcing him to work under constant fear of racial hostility and violence.

83. Defendant knew or should have known of the racially hostile work environment through Plaintiff's repeated verbal and written complaints, contemporaneous text messages, video evidence, corroborating witness statements, and communications from parents, municipal officials, and other third parties.

84. Despite actual knowledge and the ability to intervene, Defendant failed to take prompt and reasonable remedial action reasonably calculated to end the harassment, allowing it to continue and escalate.

85. Defendant's conduct violated Title VII and 42 U.S.C. § 1981.

86. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered economic and non-economic damages, including lost wages, loss of earning capacity, emotional distress, anxiety, humiliation, and harm to his professional and business reputation.

**COUNT II – RACE DISCRIMINATION & WRONGFUL TERMINATION** *(Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981)*

87. Plaintiff incorporates by reference Paragraphs 1–50 as though fully set forth herein.

**A. Protected Class and Qualification**

88. Plaintiff is a Black male of Nigerian origin and is a member of a protected class based on race and color.

89. At all relevant times, Plaintiff was qualified for his position as Director of Soccer and Executive Director of the Nisola–RoughRiders Futbol Academy. Plaintiff performed his job competently and successfully, including building and leading the soccer program, developing camps and leagues, managing staff, generating revenue, and enhancing the value and visibility of Defendant's enterprise.

## B. Adverse Employment Actions

90. Defendant RoughRiders LLC subjected Plaintiff to adverse employment actions, including but not limited to the following:

91. Discriminatorily reducing or pressuring Plaintiff to accept a reduction in compensation;

92. Withholding payroll support and financial resources necessary for Plaintiff to operate the soccer program;

93. Undermining Plaintiff's authority and ability to perform his role;

94. Terminating the soccer program Plaintiff built and directed; and

95. Terminating Plaintiff's employment in or about April 2021.

96. These actions materially affected the terms, conditions, and privileges of Plaintiff's employment.

## C. Disparate Treatment Based on Race

97. Defendant treated Plaintiff less favorably than similarly situated non-Black employees and programs within the RoughRiders enterprise.

98. Upon information and belief, white directors, managers, and programs—including the baseball program—were not subjected to comparable compensation reductions, financial restrictions, program dismantling, or termination, despite Defendant's claimed financial constraints.

99. Instead, Defendant selectively imposed financial pressure, resource withdrawal, and termination on Plaintiff and the soccer program he led.

## D. Lack of Legitimate, Non-Discriminatory Justification

100. Defendant's adverse actions were not based on Plaintiff's job performance or legitimate business reasons.

101. Plaintiff was shown internal financial information reflecting that the soccer program was operating in a positive financial position. Defendant later relied on inconsistent and disputed financial summaries to justify adverse actions against Plaintiff.

102. Defendant applied financial controls, governance decisions, and termination actions in a manner that disproportionately impacted Plaintiff and the soccer program, while similarly situated non-Black programs were permitted to continue operating.

103. These facts support a reasonable inference that Defendant's asserted financial explanations were pretextual and that race was a motivating factor in Defendant's decisions.

## E. Termination Under Circumstances Giving Rise to an Inference of Discrimination

104. Defendant's discriminatory conduct culminated in the termination of Plaintiff's program and employment.

105. Plaintiff's termination occurred in a context marked by:

106. Plaintiff's protected status;

107. A pattern of racially hostile conduct tolerated within Defendant's facilities;

108. Selective enforcement of financial and operational controls; and

109. Defendant's failure to apply the same standards to non-Black employees and programs.

110. Under these circumstances, Plaintiff's race was a motivating factor in Defendant's decision to terminate his employment. These actions were taken or ratified by Defendant's owners and senior decisionmakers responsible for employment, compensation, and program continuation decisions.

## F. Statutory Violations and Damages

111. Defendant's conduct constitutes intentional race discrimination in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

112. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered economic and non-economic damages, including lost wages, loss of earning capacity, loss of professional and business opportunities, emotional distress, humiliation, and harm to his professional reputation.

## COUNT III – RETALIATION *(Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981)*

113. Plaintiff incorporates by reference Paragraphs 1–50 as though fully set forth herein.

## A. Protected Activity

114. Plaintiff engaged in protected activity by opposing and reporting racial harassment, threats to his physical safety, and a racially hostile work environment, and by seeking legal counsel regarding unlawful discrimination and unsafe working conditions.

115. Plaintiff communicated these concerns repeatedly to Defendant's owners, executives, and managers through verbal complaints, written communications, text messages, formal reports, and the provision of video evidence.

## B. Defendant's Knowledge

116. Defendant RoughRiders LLC had actual knowledge of Plaintiff's protected activity. Defendant's senior management received Plaintiff's complaints directly, discussed them internally, and acknowledged Plaintiff's opposition to racial harassment and unsafe conditions.

## C. Materially Adverse Actions

117. After Plaintiff engaged in protected activity, Defendant subjected Plaintiff to materially adverse actions that would dissuade a reasonable employee from opposing unlawful discrimination, including:

118. Escalating hostility and interference with Plaintiff's work;

119. Undermining Plaintiff's authority and role;

120. Pressuring Plaintiff to accept a reduction in compensation;

121. Withholding payroll support and financial resources;

122. Coercing Plaintiff to participate in governance actions based on disputed financial claims;

123. Terminating the soccer program Plaintiff built and directed; and

124. Terminating Plaintiff's employment in or about April 2021.

### D. Causation: Temporal Proximity, Admissions, and Pretext

125. The adverse actions occurred closely in time to Plaintiff's protected activity and represented a marked escalation in Defendant's treatment of Plaintiff following his complaints.

126. Causation is further established by admissions from a senior manager that Defendant's leadership intended to use "fake numbers" to justify adverse actions because Plaintiff complained about racial discrimination.

127. Defendant's retaliatory motive is further demonstrated by evidence that Defendant relied on conflicting financial narratives, demanded dissolution or termination based on disputed figures, and conveyed an offer of monetary payment in exchange for Plaintiff refraining from filing a discrimination complaint.

128. These facts support a reasonable inference that Defendant's asserted justifications were pretextual and that Plaintiff's protected activity was a but-for cause of the adverse actions taken against him. Absent Plaintiff's protected activity, Defendant would not have taken the adverse actions alleged.

### E. Absence of Legitimate, Non-Retaliatory Justification

129. Defendant's actions were not motivated by legitimate, non-retaliatory business reasons, but were taken in response to Plaintiff's opposition to discrimination and safety concerns.

### F. Damages

130. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered economic and non-economic damages, including lost wages, loss of earning capacity, loss of professional and business opportunities, emotional distress, anxiety, humiliation, and reputational harm.

## VII. DAMAGES

131.    As a direct and proximate result of Defendant's unlawful discrimination, racially hostile work environment, and retaliation, Plaintiff has suffered substantial economic and non-economic damages.

132.    Plaintiff's economic damages include, but are not limited to:

a. Loss of past wages and salary;

b. Loss of future earnings and earning capacity;

c. Loss of contractual compensation and profit-sharing opportunities;

d. Loss of business and professional opportunities; and

e. Other out-of-pocket economic losses to be proven at trial.

133.    Plaintiff has also suffered significant non-economic damages, including but not limited to emotional distress, anxiety, humiliation, mental anguish, loss of enjoyment of life, and harm to his professional and personal reputation.

134.    Defendant's conduct caused Plaintiff severe psychological and emotional harm, including panic attacks, insomnia, depression, and anxiety, for which Plaintiff sought professional therapeutic treatment. These injuries were a foreseeable consequence of Defendant's unlawful conduct and hostile working conditions.

135.    Defendant's actions were intentional, willful, malicious, and/or undertaken with reckless indifference to Plaintiff's federally protected rights, including his right to be free from racial discrimination, harassment, and retaliation in the workplace.

136.    As a result of Defendant's willful and malicious conduct, Plaintiff is entitled to recover punitive damages pursuant to 42 U.S.C. § 1981 in an amount sufficient to punish Defendant and deter similar misconduct in the future.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant Roughriders LLC, and that the Court grant the following relief:

A. A declaration that Defendant's conduct violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981;

B. An award of compensatory damages in an amount to be determined at trial, including but not limited to back pay, front pay in lieu of reinstatement, loss of earning capacity, and damages for emotional distress and reputational harm;

C. An award of punitive damages as permitted by law pursuant to 42 U.S.C. § 1981;

D. An award of prejudgment and post-judgment interest as allowed by law;

E. An award of Plaintiff's costs incurred in this action; and

F. Such other and further legal or equitable relief as the Court deems just and proper.

**IX. JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

**Respectfully submitted,**

**Date: 1/12/2025**

/s/ Oluwanisola Abolaji Oluwanisola Abolaji, Pro Se



524 Hawthorn Circle Frederick, Colorado 80530

Telephone: 720-245-0971

# EXHIBIT INDEX

Plaintiff incorporates by reference the following exhibits, which are referenced throughout this Complaint and are attached hereto and/or will be filed by subsequent notice. Plaintiff reserves the right to supplement this Exhibit Index as discovery proceeds.

| Exhibit No. | Description |
| --- | --- |
| Ex. 112 | EEOC Determination and Notice of Right to Sue (Charge No. 541-2021-01536). |
| Ex. 148 | November 15, 2019 Letter of Intent issued by RoughRiders Holdings, LLC outlining Plaintiff's employment, compensation, ownership interest, and facility access. |
| Ex. E | Payroll records reflecting Plaintiff's W-2 employment, salary payments, and payroll classification under "RRS – RR Soccer." |
| Ex. 303 | Documentation of soccer camps and training programs conducted at the Sports Stable in November–December 2019. |
| Ex. 304 | Communications identifying National Women's Soccer League ("NWSL") related contacts and league-formation professionals. |
| Ex. 81 | Communications arranging a proposed meeting involving Tony Sdao, Jeff Plush (former NWSL Commissioner), and Adams Miller regarding a potential NWSL franchise. |
| Ex. 305 | Video recordings and contemporaneous communications documenting harassment and threats at the Sports Stable on January 11, 2021. |
| Ex. 307 | Video evidence of the October 26, 2020 physical confrontation involving Chad Jacobsen at the Sports Stable. |
| Ex. 147 | Written witness statement of Greg Preciado regarding the October 26, 2020 confrontation. |
| Ex. 306 | Written letter from NRFA parents documenting racially hostile incidents and safety concerns. |
| Ex. 4 | Plaintiff's formal written complaint to RoughRiders leadership dated on or about November 1, 2020. |
| Ex. 3 | Management response acknowledging responsibility and promising corrective action. |
| Exs. 78–82 | Text message communications between Plaintiff and Rylan Reed documenting harassment reports and safety concerns. |
| Ex. 125 | Written communication in which Rylan Reed disclaims responsibility for addressing reported harassment and safety issues. |
| Ex. 130 | Internal financial records reflecting NRFA's positive financial position in early 2021. |
| Ex. 60 | Profit & Loss statement relied upon by Defendants to assert insolvency. |
| Ex. 67 | Contradictory Profit & Loss statement used to support dissolution and termination. |
| Ex. 68 | Notice of Manager & Member Meeting proposing capital call, bankruptcy, and dissolution. |
| Ex. 300 | Recording and/or transcript of Manager & Member Zoom meeting reflecting financial pressure and governance demands. |
| Ex. 301 | Audio/video recording of Tony Sdao confronting Plaintiff at the Sports Stable. |
| Ex. 69 | April 9, 2021 payroll furlough letter issued by CFO Michael Perry. |

| Exhibit No. | Description |
| --- | --- |
| Ex. 105 | Bank records and financial documentation reflecting payroll funding and PPP-related flows. |
| Ex. 111 | Psychotherapy treatment records documenting Plaintiff's emotional distress and psychological harm. |